ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

MAYA KARWANDE (CABN 295554)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7236
    Maya.Karwande@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:19-CR-00585-HSG |
| Plaintiff, | [AMENDED] UNITED STATES SENTENCING MEMORANDUM |
| v. | Judge: Hon. Haywood S. Gilliam |
| JOE ANTHONY BERNAL, | Sentencing Date: June 12, 2024 |
| Defendant. | Time: 2:00 PM. |

## I.  INTRODUCTION

For five years, Defendant Joe Anthony Bernal obtained Oxycodone and Hydrocodone prescriptions without a legitimate medical need from co-conspirator Dr. Crow. Bernal used some of the pills himself and sold or traded the rest. Overtime, his relationship with Dr. Crow grew and the number of pills he was obtaining increased. Bernal would pay Dr. Crow for each prescription and then would take the prescriptions to a complacent pharmacy in Lockeford, California that was willing to fill the prescriptions, no questions asked, in exchange for a fee per prescription. As Dr. Crow's health declined, Bernal started writing the prescriptions for himself and up to 20 individuals at a time. In total, Bernal obtained 10,080 oxycodone pills and 8,469 hydrocodone pills during the course of the conspiracy. Bernal used the money he earned from the selling the pills to support his addiction and criminal lifestyle.

Once arrested in November 2019, Bernal continued to struggle with his addiction. Bernal relapsed while on pretrial release before attending residential treatment at New Bridge Foundation in May 2021. After completing New Bridge, Bernal pleaded guilty and was referred to the Oakland's Conviction Alternative Program (CAP). Bernal now comes before the Court for sentencing after successfully completing the CAP program.

## II. PROCEDURAL POSTURE AND REQUEST FOR ADVISEMENT REGARDING COUNT ONE ON THE RECORD.

On October 31, 2019, the Grand Jury returned an Indictment charging Bernal and four co-conspirators with Conspiracy to Distribute a Controlled Substance (Oxycodone and Hydrocodone) in violation of 21 U.S.C. § 846, 841(a)(1) and (b)(1)(C) and Conspiracy to Acquire and Obtain Possession of a Controlled Substance by Misrepresentation, Fraud, Forgery, Deception and Subterfuge in violation of 21 U.S.C. §§ 846, 843(a)(3) and (d)(1). ECF 1.

On July 20, 2022, Bernal pleaded guilty to the charges in the Indictment pursuant to a plea agreement with the government. ECF 158.

On August 18, 2022, the Grand Jury returned a two-count Superseding Indictment charging the two co-defendants that were set for trial, Erik Gonzales and Diane Crow, with the same charges that were in the original Indictment. The purpose of obtaining a Superseding Indictment was to clarify the *mens rea* elements of Count One as to the non-physician defendants in light of the U.S. Supreme Court's decision in *Ruan v. United States*, 142 S. Ct. 2370, 2375 (2022).and the concerns presented in Gonzales' and Crow's motion to dismiss the Indictment. ECF 168. The original Indictment charged Court One as follows:

> 10. Beginning on a date unknown but no later than on or about August 12, 2014, and continuing thereafter through on or about June 27, 2019, in the Northern District of California, the Eastern District of California, and elsewhere, the defendant,
> 
> DEANE LEO CROW,
> 
> a physician acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose, and the defendants
> 
> DIANE LYNN CROW,
> ERIK SAMUEL GONZALES,
> BRITTNEY LYNN CARDONA,
> JOE ANTHONY BERNAL,
> 
> and others known and unknown to the Grand Jury, did knowingly and intentionally conspire to distribute controlled substances, to wit: oxycodone, a Schedule II controlled substance, and hydrocodone, a Schedule II controlled substance, in violation of Title 21,

United States Code, Sections 846, 841(a)(1), and 841(b)(1)(C).

ECF 1 ¶ 10. The Indictment did not specify that the non-physician co-conspirators also needed to share the same *mens rea* as the physician in regard to knowingly and intentionally conspiring to distribute controlled substances outside the usual course of professional practice and without a legitimate medical purpose. The Superseding Indictment clarifies that Gonzales and Diane Crow "did knowingly and intentionally conspire to distribute, *outside the usual course of professional practice and without a legitimate medical purpose*, controlled substances, to wit: oxycodone, hydrocodone, and other controlled substances, by misrepresentation, fraud, forgery, deception, and subterfuge, in violation of Title 21, United States Code, Sections 846, 843(a)(3), and 843(d)(1)." ECF 188 (changes italicized).

Bernal was advised that the government intended to seek a Superseding Indictment to clarify the *mens rea* applicable to him and that he had an option of withdrawing his plea to the Indictment. Rather than withdrawing his plea and being charged by Superseding Indictment, Bernal elected to be advised of the elements and waive his right to withdraw his plea or otherwise bring a challenge based on the change. The parties respectfully request that prior to proceeding to sentencing, the Court confirm on the record that Bernal has been advised of the elements of Count One,[1] confirm that Bernal has been informed that he has an option of withdrawing his guilty plea in light of the clarification of the *mens rea* element and elected not to withdraw his guilty plea, confirm that Bernal agrees that the facts in paragraph 2 of the plea agreement are sufficient to prove that he knowingly and intentionally conspired to distribute controlled substances outside the usual course of professional practice and without a legitimate medical purpose, and confirm that Bernal waives any right to withdraw his plea or otherwise challenge his conviction on that basis.

---

[1] The parties agree that the elements for Count One of the offenses are as follows: (1) Defendant knowingly agreed with one or more persons to distribute Oxycodone and Hydrocodone without a legitimate medical purpose and outside the usual course of professional practice and (2) Defendant knowingly joined in the agreement knowing of its purpose and intending to help accomplish that purpose. There is no Ninth Circuit Model Jury Instruction for Conspiracy to Distribute a Controlled Substance by a medical practitioner. The elements are derived from Ninth Circuit Model Jury Instruction 12.5, *United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006), and *Ruan v. United States*, 142 S. Ct. 2370, 2375 (2022). *Ruan* resolved a circuit split and confirmed (consistent with existing Ninth Circuit law) that a medical practitioner may only be convicted under the Controlled Substance Act if the defendant knowingly or intentionally acted in an unauthorized manner—i.e., not "'for a legitimate medical purpose * * * in the usual course of his [or her] professional practice.'" *Ruan*, 142 S. Ct. at 2375 (quoting 21 C.F.R. § 1306.04(a)).

[AMENDED] USA SENT. MEM.                             3
4:19-CR-00585-HSG

### III. FACTUAL BACKGROUND

The PSR and the plea agreement provide a thorough recitation of the facts, which the government only summarizes here. From at least September 2013 through sometime in 2017, deceased co-defendant Dr. Crow operated a clinic in Stockton called Opti-Med, where he would see "patients" on a monthly basis and write them opioid prescriptions without a legitimate medical purpose. PSR ¶ 12. Bernal and his wife first began obtaining monthly prescriptions for Hydrocodone and Oxycodone from Dr. Crow at the Opti-Med clinic as "patients" in September 2014. Bernal would pay Dr. Crow $200 per visit for his prescriptions. Dr. Crow never performed a medical exam or diagnosed Bernal with an ailment. PSR ¶ 15. Instead, Dr. Crow just wrote prescriptions for what Bernal requested.

During this time, Bernal would use some of the pills and sold or traded the rest. Initially, it was difficult for Bernal to fill the prescriptions. Bernal knew of a pharmacy in Lockeford, California, that was willing to fill opioid prescriptions, no questions asked, but when he went there, he was told that the pharmacy was full. At some point, after another "patient" that was filling prescriptions at the Lockeford pharmacy died from an overdose, Bernal got a slot. The pharmacist at Lockeford Pharmacy would fill opioid prescriptions in exchange for a $250 fee.

Dr. Crow's Opti-Med clinic shut down sometime in 2017. After it shut down, Bernal continued to obtain prescriptions from Dr. Crow by driving to the doctor's house in Prunedale. Bernal continued to do so until June 2019, when search warrants were executed in this case. Bernal developed a close relationship with Dr. Crow and was trusted by both him and his wife, deceased co-defendant Diane Crow. Bernal would pick up the prescriptions for himself and others who previously received prescriptions from Dr. Crow at the Opti-Med clinic. PSR ¶ 17. Bernal would also pay Dr. Crow to write prescriptions in the names of others and Bernal would then take those prescriptions to the Lockeford pharmacy to be filled. Bernal continued to use some and sell or trade the rest of the pills. As Dr. Crow's health declined, Dr. Crow would provide Bernal with blank, signed prescriptions that Bernal would himself fill out. Around this time, Diane Crow also became more involved in the conspiracy, occasionally coordinating with Bernal so that Dr. Crow would give the correct information regarding prescriptions to pharmacists.

During the same period, Dr. Crow was also working with co-defendant Gonzales to write opioid

prescriptions out of the back room of Gonzales's mother's real estate office in Salinas. Gonzales managed the Salinas/ Monterey geographic area of the conspiracy.  Gonzales also acted a fake "office manager" for Dr. Crow, ordering his prescription pads, which listed as contact information the real estate office and a phone number that forwarded directly to Gonzales. Bernal did not have direct contact with Gonzales but knew that when filling prescriptions he should tell the pharmacist to call Dr. Crow's cell phone number, which Bernal would give them, rather than the number on the prescription which would go to someone else.

During the conspiracy, Bernal's drug dealing sustained his habit and lifestyle.  Bernal earned thousands of dollars a month from re-selling the pills he obtained through Dr. Crow's prescribing authority.

### III. SENTENCING GUIDELINES CALCULATION

The government agrees with the Guidelines calculation in the PSR, which is consistent with the parties' agreement in the plea agreement:

a. Base Offense Level (USSG §§2D1.1(a)(5) and (c)(3)): 34

 (At least 10,000 kilograms but less than 30,000 kilograms of Converted Drug Weight)

b. USSG §2D1.1(b)(18) -2

c. Zero-Point Offender (USSG §§4C1.1(a)(1)-(10)) -2

d. Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)): -3

e. Final Offense Level 27

 The government agrees with Probations Criminal History Score of 0, which results in a CHC of I. The corresponding Guidelines range is 70-87 months.

### IV. GOVERNMENT'S SENTENCING RECOMMENDATION

#### A. Legal Standard

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Court should begin by calculating the correct sentencing range under the Sentencing Guidelines.  *Id.*  The Guidelines are "the 'starting point and the initial benchmark,'"

*United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S. 85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process." *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007). After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Here, the most important considerations are the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to afford adequate deterrence. 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(6).

### B. Successful Completion of Conviction Alternatives Program (CAP)

Bernal's criminal conduct was of course extremely serious. As Bernal knows, the opioid pills that he was obtaining, selling ,and trading are potentially deadly. Indeed, Bernal's entry into the Lockeford pharmacy was by virtue of the overdose death of another person filling unauthorized prescriptions. Moreover, individuals addicted to prescription pills turn to other cheaper and more deadly opioids, like heroin and fentanyl, when pills are no longer available.

Bernal's criminal conduct also appears to have been driven largely by his addiction. Bernal continued to struggle with his addiction initially on pretrial release. Bernal relapsed while on pretrial release before attending residential treatment at New Bridge Foundation in May 2021. Bernal successfully completed the program and transitioned to a sober living environment. Bernal was later accepted into Oakland's CAP program. Bernal completed the rigorous CAP program, which requires a sustained period of sobriety as well as intensive mental health counseling, bi-weekly court sessions, and cognitive behavioral therapy through the Courage to Change program. Bernal completed the CAP program without any violations, which is unusual and impressive. Members of the Oakland CAP team further report that Bernal was especially supportive of his CAP peers.

The government recognizes that Bernal has achieved significant rehabilitation and transformation  while on pretrial release and through his participation in Oakland's Conviction Alternatives Program. In addition to the completion of CAP, the PSR details significant childhood trauma and abuse that are also further mitigating factors.

[AMENDED] USA SENT. MEM.                6
4:19-CR-00585-HSG

1 ████████████████████████████████████████████
2 ████████████████████████████████████████████████
3 ████████████████████████████████████████████████
4 ████████████████████████████████████████████████
5 ████████████████████████████████████████████████
6 ██████████████████████████████████████████████████
7 ███████████████████████████

### D. Sentencing Recommendation

Given Bernal's successful completion of CAP, exceptional acceptance of responsibility, and other mitigating factors detailed in the PSR, the government joins in Probation's recommendation that the Court vary downward and impose a time-served sentence, three years of supervised release, a special assessment of $100, and expanded search condition and the other conditions proposed in the presentence report. The government is no longer seeking forfeiture of Bernal's iPhone.

DATED: June 12, 2024                                    Respectfully submitted,

                                                        ISMAIL J. RAMSEY
                                                        United States Attorney


                                                         /s/ Maya Karwande
                                                        MAYA KARWANDE
                                                        Assistant United States Attorney